Case number 21-1597. Laura J. Ramos, appellant, v. Merrick B. Garland, in his official capacity as Attorney General of the United States. Mr. Kuba, for the appellant. Mr. Teep, for the appellee. Good morning, counsel. Kuba, please proceed when you're ready. Good morning, Your Honor, and may it please the Court, David Kuba, on behalf of the Plaintiff Appellant, Laura Ramos. Your Honors, this case arises under Title VII of the Civil Rights Act, a statute and a title that was enacted largely to prevent discrimination and retaliation in the workplace. We respectfully submit that reversal and remand is necessary here to achieve those purposes. Ms. Ramos brought an action under Title VII after her employer, the Federal Bureau of Investigation, retaliated against her for filing a formal complaint with the Equal Employment Office in 2011. The District Court erred when granting summary judgment on Ms. Ramos' retaliation claim. Now, the actions at issue here span past 2011. They go on for several years. I want to spend most of my time today talking about the events and actions in 2011, because I think those events and actions are sufficient alone to establish a retaliation claim that should have survived summary judgment. In May of 2011, Ms. Ramos filed an informal EEO complaint with the EEO, alleging that her supervisor was discriminating against her in the workplace. In late August of 2011, she filed a formal complaint raising those same allegations. Around this same time, her assistant section chief, whose name was Edward Finnegan, had made an offer to Ms. Ramos to transfer her to a different unit, to the Cyber Counterintelligence Unit. This would be a unit with a new supervisor, new co-workers, new work area, new opportunities, and new responsibilities. Ms. Ramos accepted that offer in an email on September 9, 2011, and her new would-be supervisor began looking forward to and preparing for her arrival. But she didn't really accept the offer because she said, I'll do it on, I think her words were, as an interim solution. Didn't she use the words interim when she had been told, this is a permanent job, if you get transferred, that's your job until you find another job? Your Honor, I'm referring to an argument that the Bureau made after the fact to explain why it didn't view her email as an acceptance. Her email says, I accept your offer. If you look at the email that was sent to her, it explained what the offer was, and it expressly says, when you take this new position, you can continue to look for other job opportunities. So when Ms. Ramos says, I'll accept it as an interim measure, that's what she's telling him. Essentially, yes, I'll go do this and I'll continue to look for other job opportunities. If Mr. Finnegan had interpreted it the way that he said he did after the fact, one would expect he would have emailed her back and said that. And that's not what his email back to her said. He never mentioned that until after this action was filed. Does it matter whether she accepted it or not? Or isn't the point that there was an opportunity that was proposed, negotiations at most were going on, or she accepted and then it was just cut off from her? It does matter for two different reasons. One, at a minimum, we're talking about a factual issue, right, with respect to whether she accepted it. And two, simply taking away a transfer offer from an employee who's been trying to transfer out of her job because of discrimination would itself be adverse enough to support a retaliation. And so her complaint was with this particular person, the acting chief, Diana Race. And I was just wondering, in the succeeding efforts to transfer, was Ms. Race still her supervisor or she was only acting? So at what point was she gone? She was gone, I believe, in December, not long after. 2011. Correct, in December of 2011. So not long after she would have filed her formal complaint. By November of 2011, there's email evidence from Mr. Finnegan describing Ms. Ramos as a known entity within her unit. There's other evidence that after that, people were aware of her having engaged in protected activity. And ultimately, whether Agent Race was there, even in August of 2011, we think it's still adverse action because when you offer to transfer somebody, they file a formal EEO complaint. The next thing you do is rescind that offer and say, we're not going to transfer you. We think that is sufficiently adverse, regardless of whether her supervisor, Race, was still in that unit or not. Just the Ortiz-DSK seems to couch this in terms of trying to get away from the discriminatory supervisor, having better opportunities. The discriminating supervisor is no longer an issue after December of 2011. Correct. I think that it is fair to analogize this case some to Ortiz-DSK. Of course, there was a discrimination case. Here, we're talking about a retaliation case. The standard for an adverse action in a retaliation case is broader than it is in a discrimination case. This court recognized that most recently in chambers, the Supreme Court recognized it in Burlington North v. White. In order to show retaliation, it really turns on whether or not a reasonable employee would be dissuaded from engaging in protected activity. We would submit that a reasonable employee would certainly be dissuaded from engaging in protected activity if it knew the cost of doing so would be to forfeit an opportunity to transfer from their existing unit. I personally think that would be true in just about any line of work. But the record here, I think, supports that it is absolutely true somewhere like the FBI, where agents depend on transferring to other units to develop their career. It's normal. It's commonplace. And so when you take away the ability to transfer from an FBI agent, you are necessarily harming their career prospects, if you will. So, just to take a step back, there are 3 requirements for a retaliation claim. There's no dispute here that Ms. Ramos was engaged in protected activity. We don't think there could be any reasonable dispute that the FBI's decision to take away her transfer offer or to not let her transfer after she accepted it, whichever way you want to interpret that. We think there is sufficient evidence that that was causally related to her protected activity. In a lot of Title 7 cases, sometimes it's hard to show that causal connection between a protected activity and an adverse action. Here we have direct unrefuted evidence that Mr. Finnegan told her in no uncertain terms, we're not going to transfer you because you have filed your formal EEO complaint. Can we move on to the other claims at issue, the temporary reassignment to backup program manager and the, I guess, denials of transfer to Boston and New York and IOD? For those, who were the decision-makers and is there any evidence that was presented that those decision-makers were aware of her EEO activity? Sure, a lot of times in the record, it's not exactly clear who's making the decisions, but just to focus on the removal of Ms. Ramos' supervisory responsibilities over the double agent program. The person who announced that change was an individual named Mr. Jett. This was in 2013 that he announced in March of 2013. Agent Jett had submitted an affidavit as part of Ms. Ramos' formal EEO complaint, the investigation process there in 2012. So, I think it's fair to assume he was aware of her protected activity. Okay, what about the others after the IOD and the Boston and New York? Sure, again, there is evidence in the record that Ms. Ramos' chain of command were aware of her protected activity. And in May of 2013, a litigation hold memo went around to all the employees who'd worked with her, who basically said, you know, she has filed this complaint in federal court. And I think, I don't want to get the month wrong, July of 20, pardon me? The litigation hold went out when? May of 2013. She filed her complaint in March of 2013, mid-March, it was served mid-March. End of March, she was removed from her supervisory position. May of 2013, the litigation hold memo went around. She was denied transfer around, kind of around the same time in July of 2013. She had a conversation with her then acting unit chief who said he was aware of her EEO complaint, who was aware of her federal district court complaint. And another individual, either her acting unit chief or assistant unit chief, mentioned that he had spoken to the EEO about it. And at one point even told her that she was not allowed to talk to the EEO without clearing it with him first. So I think there's sufficient evidence to show that her superiors were aware of this. In fact, this goes all the way back to 2011, right, when in November, her assistant section chief, Mr. Finnegan again, described her as a known entity and not as the way you'd want to be known, is what the email says. On the question of whether those decisions were retaliatory, so with the Boston and New York transfers, denial of the transfers there, the ultimate basis for the decision was because of a lack of seniority. I think that's hard to say. The Boston and New York were because she didn't meet the criteria because she had received a negative performance. Oh, that's right. That's right. But you're speaking about the IOD. The IOD one was, yeah. Of course. And in that one, it was, what they say in their brief is that it was a lack of seniority, but they refer to the deputy assistant director Smith's decision to select an individual agent Larson over other candidates. But deputy assistant director Smith didn't have Agent Ramos, Ms. Ramos, as an option because the IOD transfer was a two-stage process. So the first selection, the first decision was made further down the chain of command, closer to Ms. Ramos, and they selected Ms. Larson over Ms. Ramos. We sought discovery on the reasons for that selection. We never got discovery on it. So I guess that has to do with Brooks, I think. And I guess I didn't see anywhere in your opening brief where you actually made an argument specific to that IOD transfer swap. Is that a swap or transfer? I can't remember. Denial on retaliatory motive. Well, I think our claim would be that it was retaliatory because it was based on protected activity. They chose not to transfer her because they were retaliating against her for engaging in protected activity. That was the motivation for it. I'm not sure I follow your... I guess I didn't see anything in the opening brief that gave a reason why we wouldn't accept the government's argument that there's no genuine issue as to what the basis of the decision was. It didn't have to do with retaliation. It had to do with... I guess our point is that the government's response that it has to do with seniority is focused on the D.A.D. Smith decision, the second level. Whereas the real discrimination that we allege, the real retaliation, pardon me, that we allege occurred at that first decision level. But you don't have any evidence about what happened there. You say you sought discovery and didn't get it. That's not one of the grounds for your appeal. You're not saying that the district court should have granted a motion to compel that we had for discovery on that second level, so to speak, right? Right. No, that's not our argument. And we asked the decision maker there... How are we to find that it was discrimination, that you have evidence that that was discriminatory when you say you don't have any evidence about how that was done? Right. I think we would rely on decisions that have held that when the plaintiff comes forward with evidence that adverse actions were taken in close temporal proximity to protected activity, that is sufficient to push the burden back on the government or the other side here. And they haven't come forward with any evidence of a non-retaliatory reason that that really withstands scrutiny. The only non-retaliatory reason they identify in their briefs, as they did below, is this idea that D.A.D. Smith selected Larson because she had more seniority. They never offered any evidence as to why the decision was made by Ms. Ramos' more immediate superior. Right. And I guess that none of that is in your opening brief. Okay. That's my only point, is that you engage with that in your reply brief because the government makes a point. Yes, we engage with that in our reply brief. In the opening brief, the argument is really about spillover retaliation from what happened in 2011, which is an argument. Right. It's not that it's not an argument. It's just that the particular argument you're making now, which is to controvert what the judicial court and the government relied on below, i.e. seniority, just wasn't in your brief. Okay. I apologize for that. I thought we did raise in our opening brief the protected activity that was in close temporal proximity to the decision not to transfer her. Yes. It's in temporal proximity, but all I'm saying is that doesn't have to do with the first stage, second stage, and the particular reason that seniority isn't a valid basis. Right. That's just saying that in order to infer retaliation here, all you need to do is look back and see that there was retaliation at the outset in 2011, and that continues to carry forward. That's fair, Your Honor. I understand, and that's fair. We did not make that argument in our opening brief. We made it after the government raised it and its opposition to try to explain the lack of retaliatory. And I guess here's my question about the notion that what happened in 2011 continues to carry forward. And we ought to kind of see the taint as applying on a limitless basis going forward, which is that the suppose we agree with you on 2011. This is just for argument purposes. We agree with you. The explanation given by the supervisor was that there's an active investigation going on right now. And while that's because you filed a formal complaint and while that's going on, I'm just going to play hands off. And but that explanation in and of itself is temporarily limited. So it's not the type of thing. It'd be one thing if the record were that we really dislike you because you filed an EEO complaint and the whole division is against you because we don't stomach this. You know, you're being disloyal and that's not going to happen. And that type of thing, I could see why you could say, well, that continues to go forward. And when does that stench ever get removed? I don't know. But this one actually, by its very explanation, was tethered to that particular process. I think that's fair, Your Honor, insofar as if our claim was only that, let's say she didn't get a transfer in 2015. And our only evidence of this retaliatory is that 2011 email and the EEO process is completed. Everything's completed about her 2011 complaint. And I do think there comes a point where you can no longer rely on that 2011 email, that explanation and that refusal to transfer. There does come a point where you can no longer rely on that. I don't think we were at that point in 2013. I don't know if you could rely on that alone, if that was all the evidence you had for retaliatory animus. But again, she didn't stop engaging in protected activity. And people, her co-workers, people in her chain of command, didn't stop being aware of that protected activity in 2011. But nobody after that, I mean, there's no indication that for any of the protected activity that occurred later, that the reason for denying whatever was requested, like a subsequent transfer, had to do with the pending nature of some EEO complaint in the same way that was the case in 2011. And I don't even think you allege that. No, we don't allege that, and that's correct. We do not have the direct evidence of causation for the 2013 and 2014 alleged activity that we do for the 2011 activity. For the 2011 refusal to transfer Ms. Ramos, we think there's irrefutable evidence of causation there. For the later retaliatory action, we rely on more circumstantial evidence to try to create an evidentiary issue that we think was sufficient to at least reach a jury. On the Boston and New York transfer denials, so the stated basis is that the eligibility criteria weren't met because of the 2013 performance review. And why isn't that just dispositive? Right. I understand your question, and that is a hard case for us. But I don't think we would want to waive that argument, because here the criteria is directly tied to what we allege below as retaliatory actions. When Ms. Ramos received reviews, annual evaluations, she received an evaluation from a supervisor who'd been her supervisor for less than six months that was considerably lower than anything she had received before. The FBI then relies on that as the basis for denying a transfer. And didn't you move to amend your complaint to challenge the performance ratings? Exactly. We sought to bring that in as a separate allegation of retaliatory conduct. The district court denied that, and then it allowed the FBI to... I'm sorry, but for purposes of the transfer request, they relied on the performance evaluation, and that seems dispositive of the transfer request. But you could, if you were allowed to amend your complaint, independently challenge the performance evaluation. That's exactly right. And that's really why we would preserve our argument on this, because as it is, the FBI was able to keep out the performance evaluation at the pleading stage, and then later on in the proceedings say, oh, no, we didn't transfer her because she had this bad evaluation. But you'd have to win on being able to allow your... on getting a reversal of the denial of amendment. Leave to amend your complaint. Yes. I think that's ultimately correct. So why didn't you raise that earlier? Why didn't you try to challenge the performance evaluation earlier? Why didn't you wait? You mean, why didn't we seek an appeal on that before this? No, no. I'm now talking about your motion to amend your complaint. Okay. It was denied by the district court, and one of the factors for that is your timing. Why did you move to amend with respect to the performance evaluations at the time that you did, instead of raising it earlier in the case, perhaps in your first complaint? Right. I don't know if it... There have been a few different amended complaints and a few different motions to amend that were denied. We did have a couple of complaints that were denied because we hadn't exhausted the administrative process yet. So Ms. Ramos filed additional EEO complaints, as I referred to the additional protected activity. We tried to add those allegations, those alleged acts to our complaint before the EEO process had been completed, and the district court said we couldn't do that. When was the EEO process exhausted? Was there an EEO claim made for the negative performance evaluation of 2013? That's the year of the performance evaluation. Correct. Yes. It may have been early 2014, Your Honor. I don't want to misstate the record. I cannot recall if that was part of one of her EEO complaints. I suspect that it was because Ms. Ramos was very diligent when it came to getting things in front of the EEO and trying to preserve her rights, but I don't want to say that without being 100% sure of it. But I know it for certain. Well, in the district court's denial of your motion to amend it, she didn't accuse you of being dilatory or anything. Right. That wasn't one of her bases. That was one of her bases. No, it was not. It wasn't. It was not. Thank you, Your Honor. I didn't think it was because she was the one who had had us complete the administration. But she did conclude it was unduly delayed. She did cite the undue delay criteria. I don't think so. In denying you leave to amend the complaint? I think she did say it was late in time, but not unduly late. So, in other words, at one point she denied a motion to amend because she said a lot has happened. You know, we're at the close of discovery. These events happened later. But she didn't say that we had, you know, dragged our heels or done anything improper in terms of moving to amend. Because, again, we moved to amend. I thought specifically she specifically referenced undue delay, but I could be wrong. Well, she definitely referenced that there would be prejudice. And I thought that the district court said undue delay. But cut to the heart of the matter, you've got to convince us that there was an abuse of discretion. What was the abuse of discretion? I would say the abuse of discretion began with the way that she treated the retaliatory conduct in 2011. Oh, no. I think on the motion, the denial of the motion. Denial of the motion to amend. Yeah. I guess we would just say that under the standard for amendment, which is typically freely given. Of course, that freely given leave becomes less so as the case goes on. We would just submit that clearly these events are related to the events that are in the complaint. We're talking about the performance evaluation today as a basis for them denying a transfer. That's part of our complaint. So her conclusion that they weren't sufficiently related to be part of the complaint, we would say was an abuse of discretion. As subsequent proceedings have sort of. That's another item which you can correct me if I'm wrong and you can correct me in rebuttal if I'm wrong. And I never mind being corrected. I thought in the opening brief, I didn't see an argument that there was an abuse of discretion in the district court's determination that the seeking of leave to amend was unduly delayed and prejudicial. I think you made arguments that that should have been granted because it was wrong to think that it would have been futile because as a matter of law, you actually had enough. Right. But I didn't see anything in the opening brief that talked about that took on the district court's determination. Whether it was sufficiently related. That it was unduly delayed and unduly prejudicial to have these. No, I don't think we challenge that. I'm not sure that the court had ruled that way against us. So if I may, I'm looking at the transcript now. It seems that in the context of undue delay, she said that granting your motion would unduly delay this action or cause undue prejudice. She wasn't saying that you unduly delayed in filing your motion on these claims. And I think that's an important distinction. Correct. And that's my recollection as well. And if we were speaking past one another, Your Honor, I'm happy to address the question of whether it would unduly delay the proceedings and not whether we unduly delayed in seeking leave to amend. You know, I think. But she found undue prejudice. Pardon me? She said it would be unduly prejudicial. To the government, correct. Yeah. But not because of anything we did wrong. I guess I don't know where the prejudice is, especially given. We're already talking about a long time since the events took place. You know, it would be nice to have all of the various acts that were taken against Ms. Ramos treated in a single case so that she didn't have to file a separate complaint. She has a second complaint pending now about some later retaliatory acts. I'm not sure, really. Granted that discovery had taken place, but we hadn't saw it, obviously, since we hadn't had our complaint amended. We hadn't sought any additional discovery on these new allegations or claims. I'm not sure that it would have really created a whole lot of new work. But that doesn't seem like a good basis for a good basis for denying leave to amend. But in the abstract, I think that would have been a better thing to. I mean, isn't isn't the general point that. Look, I have a summary judgment motion, which, if it has merit, will end the case. And I have a motion to amend the complaint, which, if I grant, means that I can't resolve this case and get it over with. We have to go back and do discovery, et cetera, et cetera. And it's going to be another year before I can resolve it. And, you know, all good cases must come to an end. You know. That are bad. I mean, isn't that basically what the district court saying and why isn't that just. I guess what I'm trying to find out is, like, who then on if our standard of review is differential, which is what an abuse of discretion standard is. Where where is the abuse there? Right. Take it taking it back to the beginning of your question when you talk about resolving summary judgment. I guess 1 is we don't think we never thought obviously that summary judgment should have been resolved against us. I don't think our motion to amend preceded briefing being finished on the summary judgment motion followed by the government. I think it was filed before the summary judgment briefing was was finished. I think I know it was filed before. Yes, it was filed before the summary judgment briefing was finished. There were certain delays and stays in the case and was it filed before the opening brief for summary judgment? I think so, because I didn't see anything from the government moving to strike it or saying, hey, you can't amend your complaint on the summary judgment. I don't know that we thought discovery was still open. I could be wrong, but that was my recollection. That may be right. The timing is important. Right. I hated nothing more is a district court judge in seeing a summary judgment from 1 side and then getting a motion to amend on the other side. No, I can appreciate. I thought we were at the point where we're going to as a practitioner. I hate getting a motion to amend after filing a summary judgment. I can totally appreciate where you're coming from on that. Could you check check your records and answer that on rebuttal? Yes. Explain the timing of your motion to amend. Yes. Whether discovery was still ongoing and whether the timing of it was due to the fact that she had at that point exhausted her claims. Right. And the relevant motion to amend with a 2015 1 because there was there were other ones. There was 1 of them that doesn't matter anymore because you filed a new lawsuit. Right. Or somebody called a new lawsuit. Yeah, I think if we're speaking about the 2015 1, I think your honor is right. That discovery was still open. Certainly, they hadn't called a motion for summary judgment on the entire case in 2015. My colleagues will have additional questions for you this time. Thank you. Thank you counsel later from your government. Now, Mr. T. Good morning, may please court on T on behalf of the government. I want to address a number of the arguments made by a pellant and clarify the record. I'll start with the 2013 2014 transfer request by Miss Ramos. I think the panel has hit on the right points, which are number one that the actual decision makers for those transfer decisions. There's no evidence in the record that they had knowledge of Miss Ramos is protected activity or certainly not protected activity within the temporal scope that in the court say. Well, we can infer perhaps some retaliation because it occurs right after a protected activity. And so, for example, with the international operations division, it was a swap of supervisory special agents. The decision maker there was deputy assistant director Smith. There's no evidence in the record that Miss Smith was aware of. I guess in this point, this is March of excuse me, October of 2013 that she was aware of. Does there have to be specific evidence that a particular person was aware? Is it just enough to know that it was generally out there? No, according to the sports Talavera decision, you need to have evidence at least that summary judgment. Now, if you're talking about a motion to dismiss and whether or not there's a prima facie evidence or a few fish cases we made. But at summary judgment, you need to have evidence that the decision maker was knowledgeable of the protected activity because otherwise the action of that decision maker would not be because of the complainants protected activity. We can infer that, though. And I want to ask you about when Miss Ramos was temporarily reassigned from the program. She had been the program manager for that. She went out on medical leave. She had been back for two months and on March 19th, she serves the FBI with her complaints. Then on March 28th, jet announces that Anthony Wagner is the new manager relegating her to the backup program manager. And he says this was supposed to help her with her medical condition, but she'd been back for two months already at that point. And he waits until a week after he files her complaint to do that. Two points, your honor. Number one, there's no evidence in the record that Mr. Jet was aware of Miss Ramos filing a federal court complaint. One number two, Mr. Jet had raised with Miss Ramos while she was on leave in January. So before the alleged protected activity that supposedly would be relied on for retaliation and said, I listen, I, I'm being swamped. Because he was the acting unit chief, had his own responsibilities. He was taking on the double agent program responsibilities while Miss Ramos was out. I'm getting swamped. I want to bring someone in to help me out. And I understand Judge Penn saying, well, you know, by the time that this actually happened, it was in March. But that's just a function of the fact that he couldn't find someone to do a temporary detail. This individual, Tony Wagner, he was going to be retired. He had time and availability. And so they bring him in and they don't take away the jury to decide. I mean, the timing seems like it could support her claim. And we could just let the jury. Well, according to Woodruff Peters, timing is not sufficient. If there is a legitimate explanation for the action in here, the jury would decide that. No, but the question here is, and again, that the plaintiff or the appellant has to come forward with evidence to rebut the explanation to say that what Mr. Jett said was pretextual. And there's no evidence in the record to suggest that Mr. Jett was making up this explanation for why he was reassigning Miss Ramos temporarily to be the backup while she recovered. From her injuries and her medical leave. And so what we're saying is on the double agent program reassignment, there's two problems for appellate here. One is that there's insufficient evidence that was taken because of her protective activity. And number two, as we've argued below, there's also no material adverse action here because one of the things that this court looks to in determining whether or not just a change in work assignments is material is, well, is there a significant difference and diminishment in the responsibilities? And while this program was Miss Ramos's highest profile program, she did testify that she had other high profile program. And so when you look at the entire context, it's clear that this was not a material adverse action as the district court had found. But the materiality of the responsibilities is generally a jury. The standard by this court is that under Sikalsky and has been supported in other cases that there needs to be a significant difference and diminishment and responsibilities. And that's a question that this court can make. And so it was twenty eleven. Yes. So there's just evidence in the record that the reason that the transfer wasn't moved on is that she filed an EEO complaint. That's just that's the government's own testimony and indication in the email that she got. Why that has to go to the jury at that point, it seems like because that is retaliation. It's not necessarily bad faith. I'm not suggesting that somebody or ill will and thought that there was supposed to be a penalty here or anything like that. But it's just it is a reaction to the filing of a formal EEO complaint. And it just seems like just as a matter of law, that at least goes to the jury because there's direct evidence. The filing of the formal EEO complaint was reacted to by withdrawing potential transfer that otherwise would have been made available. Respectfully, your honor, the government districts and there are two important points to make with regard to the twenty eleven transfer. First, is that a decision here by Mr. Finnegan to defer to the formal EEO process is not likely to dissuade a reasonable employee from engaging in the EEO process. That's the test under Burlington Northern. Really? So if somebody gets if a supervisor just comes to it, a subordinate and says, here's the deal, you can file the formal EEO complaint if you want to. But I'm just letting you know, if you do that, we're not going to give you your transfer. We're just going to let that play out. There's an important distinction in this case. This isn't a case in which Ms. Ramos was put in for a transfer and was denied for a transfer. Again, we have to start with where this all begins. And that is a complaint about Diana Ray's claim for discrimination that was made informally in May of twenty eleven. What Ms. Ramos said is that to resolve my discrimination complaint, I would take a transfer. Mr. Finnegan, he decided that he will try and find a transfer location for Ms. Ramos. He was unsuccessful, or at least there was, as Judge Wilkins stated earlier in raising the interim measure. According to Mr. Finnegan, there was not an acceptance of what he was offering, which was a permanent reassignment. And so what Mr. Finnegan told Ms. Ramos on September 9th is, I've been notified that the EEO matter has now been made formal. And the next step is mediation. Since there's now an official formal process underway to address the issue, I think the most appropriate course of action is to allow that process to determine where you go and under what circumstances. And so what Mr. Finnegan was doing was he was participating in the EEO process, trying to find an informal way of resolving this. That did not seem to work at the time that Ms. Ramos had now, as of August thirty first, filed a formal complaint. He learns subsequently that, hey, this has gone formal. The next process is mediation. I'm going to hand this off to the mediator. And what is, I think, also important for your honor to understand is that in that August thirty first email, Mr. Finnegan. So we have a case foreman. We have a case foreman that involves pretty similar situations. It also involved an EEO matter, and it also involved an explanation to the effect that it's not bad faith. It's totally good faith, but we're going to hold off on your request because of the EEO process. And we held that that goes forward. Well, I'm not familiar with that case, your honor. But in this case, where Mr. Finnegan is handing off, and what I was going to say is that copied on that August thirty first email is Peter Giancopulos. He's the person that Mr. Finnegan identified as being responsible for the mediation. That is at J.A. three eight nine days later. Mr. Finnegan provides Mr. Giancopulos download on the back and forth about his efforts to informally find a transfer from his Ramos and also provides his availability for mediation sessions. That's at J.A. six one ten. Miss Ramos actually withdraws from the mediation process, and that's at J.A. one zero three nine. And so the context, and as the Supreme Court in Burlington, Northern says, context matters in the context of this case. What we have here is Miss Ramos engaging in the EEO process, trying to have an informal resolution. Yet the FBI is trying to do that and then but it didn't succeed. And so what happens is the process moves forward. And so Miss Ramos, in some sense, was left no worse off than if Mr. Finnegan had not even tried to provide a transfer option. The next step is the formal mediation process. So, yeah, in your view, it would have been fine if Mr. Finnegan went to Miss Ramos and said to her before she files a formal EEO complaint, everything else stays the same. He goes to her before she files a formal EEO complaint and says, it's up to you. If you file the formal EEO complaint, I can't help you out with the transfer. It's up to you. You can file the formal EEO complaint if you want to. But if you do, I'm done with the transfer. But that's not what he said. But I'm asking you, could he do that? Would that have been fine or would you still have the same argument? Well, again, I think it would be difficult for a reasonable jury to conclude that the man who has just spent a couple of months trying to find her a transfer then tries to interfere in the EEO process in such a way. But I thought what we were talking about is whether somebody would be dissuaded. And I guess what I'm putting to you is a hypothetical where instead of after she files a formal EEO complaint, he says, I can't do anything more. I'm not going to do anything more with your transfer request now because it'll leave it in the EEO's hands. Instead of doing that, if you went to her before she filed the formal EEO complaint, he says, I understand you're thinking about filing a formal EEO complaint. Here's the deal. You could do that. But if you do that, I'm going to withdraw from helping you with this transfer. And would you say that she should look at that and think, well, that's not going to affect my decision about whether to file the formal EEO complaint. It's not going to dissuade me at all. I'm just going to do what I'm going to do anyways, if he never said that. I think I think a reasonable jury, a reasonable employee would not be dissuaded. They would say, okay, well, the resolution to my discrimination claim is not occurring now. Therefore, I need to continue with my discrimination complaint. So, no, I don't think under even that hypothetical, which is not the facts of this case, that it would be a reasonable, a reasonable employee would be dissuaded. But there's one other point that I think is important and I want to correct the record. And that is that when Mr. Finnegan made his decision to defer to and hand off to the EEO process, the person that Ms. Ramos was complaining about was no longer her supervisor. And I'll direct you to JA 601 and 602, where Mr. Finnegan is making reference to Ken James, who was her new supervisor. And so, and this is one of the things that makes us different from the Ortiz-Diaz case, as relied upon by Appellant in the briefing. And that is Ms. Ramos is not being left with the person that she feels is discriminating against her. She has a new supervisor. And so at the time that Mr. Finnegan makes the decision that, hey, we now have a mediation process, which all evidence suggests that he was going to participate in because he's giving the mediator his schedule for availability, is that she had a new supervisor who was happy to have her. Again, those two JA sites support that. She would be, you know, continuing on with her EEO process. And otherwise, as the district court found, she was not materially harmed because that's what the court uses. Like, okay, is there a material injury here? And that's how we decide is this going to dissuade a reasonable employee from engaging in the EEO process. I'm sorry. So you're saying that she files her complaint against this particular supervisor. And by the time the transfer is withdrawn, the supervisor has changed? That's correct, Your Honor. That's correct. And so what happens to the EEO complaint once the supervisor isn't her supervisor? Doesn't become mooted or anything? No. And but again, her claim continues. I mean, this is, in some sense, you know, this is the process. The process, the EEO process is set up so that there is an informal complaint. There's a period of time in which the employer and the employee can figure out, okay, do I really want to continue with this? Is there an informal resolution? Mr. Finnegan participates in that. And then, you know, by the time he gets an answer, nine days for his offer, which again, he didn't think was ultimately accepted because, you know, there's evidence in the record that she wanted a temporary detail. He couldn't do that. And so, but the evidence in the record is that, you know, by the time September 9 rolls around, there's just a new process. And that's just how the process works. So for purposes of material adversity, you're saying that it doesn't have the element from Ortiz Diaz that she would have an opportunity to get away from the discriminatory supervisor? But there's also evidence that she, I guess a little bit later on, she's now become a known quantity, somebody who's a complainer. Does that affect the analysis on material adversity? She can get out of the job where she has a reputation and have sort of a fresh start and better opportunities. Well, I guess I think Appella has to pick what argument she wants. You know, in with the known quantity thing, that's a known entity. That was a remark in November of 2011 with respect to her grieving elements of a performance review. And but, you know, that doesn't make what happened in September material. And so but it's stating something that might have happened earlier, like that the statements made in November, but she might become a known entity. I mean, there's a lot of a lot of speculation. She was a known entity at that time. You know, when it ripened. Exactly. Right. But I think ultimately, if I were to encapsulate the entire case here is that there's just a lot of failures of evidentiary proof. We see that in the transfer where there's no evidence that the decision makers were aware. There's no argument or evidence of pretext for the explanations for these various decisions. The district court got it correct. And I understand that I'm I've run over. And so if there's any other questions, I'm happy to take it from the honors. Could you address the denial of the motion for leave to amend? Oh, yes. Because I understand that the timing was that the motion for leave to amend was filed July 31st of 2015. I'm sorry. The motion was called August 25th of 2015, but the performance evaluation claim exhaustion happened on July 31st of 2015. So that seems timely, right? The issue here with a couple of things on the amendment, as one of your honors noted, plaintiff has an articulated a basis. That judge Jackson's decision not to amend on certain issues was an abuse of discretion and with respect to the grieving, the performance evaluation. That was an allegation that was made in the context of other allegations about how the FBI allegedly handled her leave in 2013 and her return from leave. And so there were a variety of allegations that judge Jackson said, okay, here, here's a bunch of stuff. That's new. It's not related to the original case. And so you're so the allegation was not that performance evaluation was in retaliation for the same protected activity from protected activity. Is that what you're saying? No, what I'm saying is that appellant hasn't demonstrated as an abuse of discretion in keeping out the allegation of of of the performance appraisal in 2013. But I believe the district court said a number of things. Some things were futile. Something she said arise out of different facts. I'm just trying to hone in on what you're saying happened because I don't know that it arise arise out of different facts because come to find out on summary judgment. You're relying on those very same performance evaluations to say that there was no retaliation and not going to the transfer. So it seems to be part of the same nucleus of facts. And then the question is just where you're supposed to allow amendment. It's supposed to be freely given unless you actually have a reason not to. It seems that discovery was open. These claims have just been exhausted. Why? Why is it not an abuse of discretion to deny that if it is part of the same nucleus of facts? There was no it wasn't undue delay on their part. They did it as soon as that was exhausted. It was not presented as as part of the same nucleus of facts. It was presented in proposed paragraph 18 C and that allegation about her minimally successful rating was alleged in the context of events that occurred while she was on leave for surgery in December of 13. And and all of those allegations about what happened during her leave and after her leave was determined by Judge Jackson in the exercise of her discretion as being not sufficiently related to the original. So it is true as my recollection is it is true that the way they were teed up seemed to tie the allegations about the 2013 performance review to the ones about the firearms. And so it seemed like it was a different factual complex. I think my recollection is that is right in the way it was teed up, but in the way that the 2013 performance evaluation actually factored into the denial of summary judgment. It turns out it's not factually distinct because that is the basis for saying that there was a denial of a transfer for to Boston and New York. But there's but there's essentially what that if it came into the case, that is, if the 2013 performance appraisal had come into the case as its own claim, then the evidence of of it factoring into a transfer later on will be evidence of materiality of that, you know, retaliatory allegedly performance appraisal. It would not make a subsequent decision by a different entity using different criteria retaliatory. I think I think it could. It definitely could. Because if there's retaliation that ultimately is manifested in a denial of transfer, that kind of thing happens that we have discrimination claims where even if the ultimate decision maker is based on making decision based on something that they think as sanctity, that if it's infected in the process going up, that ultimate decision is still valid. And that that would that's what would be the basis here is you'd say the 2013 performance review was a product of retaliation. And then that became the basis for the denial of transfers to Boston and New York. Respectfully, I'm not aware of a akin to a fruit of the poisonous tree situation. Isn't that the cat's paw theory? Isn't that basically how that works? But you actually have to in the cat's paw theory, it would be you would be infecting the retaliatory, the original retaliatory person with the retaliatory animus would then be infecting the decision by the, you know, for the later decision. And that's that's kind of what we have here is that is that later on you have a transfer unit making a decision based on its neutral criteria that most recent review session, you need to have at least a minimal performance appraisal. And so that wasn't there. And so the cancer decision is still about. So let's let's suppose that that that the undisputed evidence based on videotapes were that we're going to give her a bad performance review so that she'll never, ever be able to transfer in the future. Because we don't like her because she's filed EEO complaints. And and then it's also undisputed that later the FBI transfer unit, they know nothing about her activity there. Their motives are completely pure. And they just say, well, based on the criteria, we can't consider you for prove you for transfer because you don't have satisfactory performance appraisals. So you're saying in that world, summary judgment gets granted for the government and it doesn't matter that there was essentially, you know, discriminatory action to to prevent her from ever being transferred in the future. I believe that's correct, because, I mean, we also have to assume that, you know, there's materiality present. Let's assume that. And so if we're just focusing on causation, there's still no evidence that the decision, the later transfer decision under challenge was because of her protected activity. If that decision, as it was, was based on a neutral policy, there isn't, you know, perhaps the facts, if there was some connection, some some actual factual connection between the two events that taints the later event. But here, you know, it's a separate allegation, the separate discreet event. And the question before the court is, did the district court make the right decision? And this record make the right. So your argument is that she she would have a claim to, you know, assuming she exhausted, et cetera, to challenge the negative performance evaluations as a claim. Correct. But that that is essentially irrelevant, or at least not enough to to defeat summary judgment when those discriminatory performance evaluations were used in the later transfer. I agree with that. And so you're saying the district court didn't abuse its discretion in denying the motion to amend to add this. So, is it your position that she should just bring a whole new case alleging the retaliation based on the performance evaluations? Why is that better than just putting it into this case? Well, again, it's not a question is, you know, is it better or not? The question is, did Judge Jackson abuse her discretion? And she didn't because she interpreted the complaint. And, you know, based on, as the chief said, you know, this was allegations made the context of other events. And she said, OK, I got nearly two dozen additional allegations of retaliation. What do I do with it? And so she made a very thoughtful analysis using the Rule 15 standards and said, OK, these ones are just too distinct from the original allegations and it would cause delay, additional discovery in terms of the timing, which I know is one of the questions. This amendment occurred six weeks before the schedule closes discovery. And, you know, and so that was factoring into Judge Jackson's analysis that, hey, listen, this is where we're basically at the finish line. And now we want to. My colleagues, I have additional questions for you. Thank you. Thank you. Thank you. We'll give you two minutes for the bottle. Thank you, your honor, and I'll try to be try to be quick. I appreciate the time. I guess the first observation I want to make is a general one and it's how much these arguments that you're hearing today depend on the facts of this case. The evidence, the competing evidence in this case, I think that goes to our broader point that summary judgment should not have been entered against Miss Ramos just to address a few of the specific points counsel for the government raised one. He said that there's no evidence that that what jet did when removing Miss Ramos. There's no evidence that their explanation for removing Miss Ramos from her position. Supervisor position was protects tool. They ignore the 2nd time that they removed Miss Ramos from this position. They offer and the district court made the same mistake. They focus on the temporary removal of her from this position in favor of another employee who then stepped down unexpectedly 2 months later. They put Miss Ramos back there, but they got rid of her a 2nd time. They never offer an explanation for that. They don't say it's because they were busy because she was on leave because she wasn't on me. So, they haven't offered any non protectural reason as to why she was removed that 2nd time. The 2nd point I want to address concerns to 2011 transfer. I neglected to mention earlier, but Mr. Finnegan understood at the time he said he would defer to the or effectively the time that he removed the offer to transfer Miss Ramos. He understood at that time that he could have consummated the transfer and allowed her to go to that new position. He chose not to do that. We think the court's correct and it's at least it's questioning that suggests that's retaliatory. We think clearly it meets the standard set forth in Burlington North B White because. Again, any reasonable employee would be dissuaded from filing a formal complaint if they knew if I file this formal complaint that transfer offer I want that transfer I want that's been offered to me. If I follow this formal complaint, I'm going to lose it. That's exactly the kind of thing that would dissuade a reasonable employee from engaging in protected activity. Just to paraphrase an observation this court made in the chamber's case, refusing to transfer 1 employee, but transferring a 2nd employee, it treats the 1st employee worse than the 2nd employee. We think there's a certain common sense element here that refusing to transfer someone after you told him you'd transfer him because they filed a formal EEO complaint is not only does not only have retaliatory intent, but it's adverse because it differs. It deters protected activity. The other point I'll make on the argument that the government makes about deferring to the EEO process is this isn't this isn't a defense that they raised in their answer that we didn't retaliate because we were deferring to an agency. It's not an argument that they raised in their briefs below, at least not a legal argument. Instead, it's 1, they came up with on appeal for the most part that says. You know, what they were really doing was handing it off to the ultimately it doesn't matter what their explanation is after the fact, when you take away a transfer offer someone from someone that you don't have to take away. That's that's adverse action, but I didn't want to at least know that unless the motion to amend. I mean, don't we have to we can't Monday morning quarterback so to speak district court. Well, if if the motion to amend articulated. Like, the argument for why these things were related and why the amendment should be granted. And didn't really connect up the performance evaluations to. These transfer requests in 2014, 2015, or I guess they were all in 2014. Can't blame the district court for that. We can't say that that's an abuse of discretion that the district court. Couldn't look in their crystal ball and know that they were going to actually want to be related. That was that was plaintiff's job to explain the connection, right? That is fair and your honor's question reminds me that I didn't answer your honor's question about discovery. It was still open as of the time we moved to amend in 2015 to add this. And I think that's an important point when we consider whether or not the judge abuse or discretion discovery was still open. We didn't know exactly how the government might attempt to explain away the 2013 and 2014 retaliatory actions. And as it's played out, we see now that that performance was discovery likely to be able to be concluded on these new claims within 6 weeks. I think that would have been a challenge if I'm answering. Yeah, exactly. So, so discovery was still open, but granting this motion was going to require extending the discovery deadline, right? Correct. It would have required extending the discovery deadline. My point is that we wouldn't know. We weren't at a point in the litigation where we could explain the connection between the performance evaluation and refusal to transfer to Boston in New York. Because we didn't know the government would be relying on that the way that they. Why, why wouldn't you know that? Why didn't you take a discovery on those transfers to New York and Boston transfer request? I believe, yes, we had taken discovery on that. And again, I'm not sure what our particular arguments were when moving to amend. And I don't have that proposed amended complaint in front of me. Unfortunately, I do know that it was a, at least according to the government, it was a sub paragraph. That we raised allegations in, which suggests to me that it was part of a sort of broader allegation. But again, I apologize that I don't have that information readily readily available to answer your question. Thank you. Thank you. Counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Wilkins, Pan